ALYSSA A. QUALLS (IL Bar No. 6292124)
*PRO HAC VICE* APPLICATION PENDING
Email: quallsa@sec.gov
BELINDA I. MATHIE (IL Bar No. 6275461)
*PRO HAC VICE* APPLICATION PENDING
Email: mathieb@sec.gov
175 West Jackson Blvd., Suite 1450
Securities and Exchange Commission
Chicago, Illinois 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

Attorneys for Plaintiff
United States Securities and Exchange Commission

LOCAL COUNSEL
Donald W. Searles (Cal. Bar No. 135705)
Email: searlesd@sec.gov
Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY DEMAND** |
| CHARLES WINN LLC, AARON DAVID SCOTT-BRITTEN, aka AARON DAVID, AARON SCOTT, and AARON DAVID K. BRITTEN, OHRAN EMMANUEL STEWART, aka ELLIOTT STEWART, CASEY ALEXANDER, and CHARLIE JAKE SMITH, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The SEC brings this action pursuant Section 20(b) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77t(b), and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(d).

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d), and 22 of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v, and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a).

3.     Defendants, directly and indirectly, made use of the means or instruments of transportation or communication in, and the means and instruments of, interstate commerce, or of the mails, or of the facility of a national securities exchange in connection with the alleged acts, practices, and courses of business alleged in this Complaint.

4.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a). Acts, practices, and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Central District of California and elsewhere. Moreover, at least 15 victims of Defendants' alleged securities violations reside in California, and six victims reside in this district.

## SUMMARY

5.     Between January 2018 and September 2021, Defendant Charles Winn LLC ("Charles Winn"), through Defendants Aaron David Scott-Britten ("Scott-Britten"), aka Aaron David, Aaron Scott, and Aaron David K. Britten, and Ohran Emmanuel Stewart ("Stewart"), aka Elliot Stewart, Charles Winn's senior managers, Defendant Casey Alexander ("Alexander"), its senior sales representative, and Defendant Charlie Jake Smith ("Smith"), its record managing member, engaged in a fraudulent investment scheme involving fine wine.

6.     Charles Winn raised at least $8.5 million through the fraudulent and unregistered offer and sale of investment contracts to at least 121 investors in the United States, most of whom are elderly. Scott-Britten and Stewart orchestrated the fraudulent scheme, and Alexander and Smith participated in it.

7.     Charles Winn, through Scott-Britten and Stewart, its sales representatives, including Alexander, and marketing materials, represented to investors that Charles Winn would buy investment-grade wines for investors, later sell the wine at a profit, and would share in a portion of the profits with investors.

8.     Charles Winn, through Scott-Britten and Stewart, its sales representatives, including Alexander, and marketing materials, falsely represented to investors that: (a) their money would solely be used to purchase and store wine; (b) the wine could be expected to achieve a return ranging between 10% to 45%; and (c) the company would not receive any compensation or profit until the wine was sold; and failed to disclose that sales representatives received up-front commissions of 5% to 15% from investor funds.

9.     These statements were false because Charles Winn, through Scott-Britten, Stewart, and Smith, spent no more than 43% of the investors' funds on the purchase and storage of wine.

10.     Further, Charles Winn, through Scott-Britten, Stewart, and Smith, made only *de minimis* payments to investors, and misused investor funds by spending them on a variety of non-wine uses, including at least $1.7 million for payments to individuals, including sales representatives and workers who performed back-office functions for Charles Winn, which included at least $311,094, $483,596, $121,156, and $43,459 directly to Scott-Britten and Stewart (and their family and/or affiliated entities), Alexander, and Smith, respectively.

11.     From January 2018 and September 2021, Scott-Britten and Stewart acted as control persons of Charles Winn.

12.    Defendants' scheme has now collapsed, and the company has stopped responding to investors.

13.    By engaging in the conduct described above, Defendants violated numerous provisions of the federal securities laws, including antifraud, securities offering registration, and broker registration provisions as detailed below.

14.    The SEC seeks to enjoin each of the Defendants in this action from violations of federal securities laws, and seeks disgorgement of their ill-gotten gains, on a joint and several basis, along with prejudgment interest and civil penalties. The SEC also requests that the Court bar Scott-Britten and Stewart from serving as an officer or director of public companies.

## DEFENDANTS

15.    **Charles Winn LLC** is a Delaware limited liability company formed in August 2017 with its principal place of business at a virtual office in Wilmington, Delaware. In 2021, Charles Winn was the subject of state securities or consumer protection orders in California, Illinois, Michigan, Oklahoma, Texas, Washington, and Wisconsin in connection with its wine investment business. The state orders found, among other things, that Charles Winn's wine investment business constituted an unregistered offering of securities and that Charles Winn made material misstatements of fact in connection with the offer or sale of securities. Charles Winn has not registered with the Commission in any capacity, nor has it ever registered any offering of securities under the Securities Act.

16.    **Aaron David Scott-Britten**, aka Aaron David, Aaron Scott, and Aaron David K. Britten, age 33, is a citizen of the United Kingdom believed to reside in London, England. Scott-Britten was a *de facto* co-owner and senior manager of Charles Winn. Scott-Britten has not registered with the Commission in any capacity, nor has he ever registered any offering of securities under the Securities Act.

17.    **Ohran Emmanuel Stewart**, aka Elliott Stewart, age 36, is a citizen of the United Kingdom believed to reside in London, England. Stewart was a *de facto*

4

co-owner and senior manager of Charles Winn. Stewart has not registered with the Commission in any capacity, nor has he ever registered any offering of securities under the Securities Act.

18.   **Casey Alexander**, age 26, is a citizen of the United Kingdom believed to reside in London, England. From approximately 2017 to 2022, Alexander acted as a senior sales representative for Charles Winn. On June 14, 2022, Alexander was arrested on a criminal complaint in the Northern District of Ohio and charged with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, arising out of a fraudulent wine and whiskey investment scheme involving Charles Winn LLC, Windsor Jones LLC, and VWC LLC. *United States v. Alexander*, 1:23-CR-149-SO-1 (N.D. Ohio). On March 21, 2023, Alexander waived indictment and pleaded guilty to an information charging him with conspiracy to commit wire fraud arising out of a fraudulent offer and sale of wine and whiskey investments by Company-1 and Company-2 to U.S. investors. *Id.* Alexander has not registered with the Commission in any capacity, was not associated with an entity registered with the SEC as a broker, nor has he ever registered any offering of securities under the Securities Act.

19.   **Charlie Jake Smith**, age 27, is a citizen of the United Kingdom who resides in London, England. Smith founded Charles Winn and was its record managing member. Smith had sole signature authority over Charles Winn's U.S.-based bank accounts. In 2021, Smith was the subject of state securities orders in Illinois, Texas, and Wisconsin, which found, among other things, that Charles Winn's wine investment business constituted an unregistered offering of securities and that Smith and Charles Winn made material misstatements of fact in connection with the offer or sale of securities. Smith has not registered with the Commission in any capacity, nor has he ever registered any offering of securities under the Securities Act. Smith entered into tolling agreements to toll or suspend the running of any statute of limitations for a period of five months.

**FACTS**

20.　Section 5(a) and (c) of the Securities Act requires persons who offer and sell securities to the public to register those offers and sales with the SEC, absent certain exemptions or safe harbors that do not apply to Defendants' transactions.

21.　The definition of a "security" under the Securities Act includes, among other instruments and investment vehicles, "investment contracts."

22.　Investment contracts are instruments through which a person invests money in a common enterprise with an expectation of profits or returns produced by the entrepreneurial or managerial efforts of others.

23.　Between January 2018 and September 2021, Charles Winn raised at least $8.5 million from approximately 121 investors in the United States through the sale of purported fine wine investments that were investment contracts.

24.　The Charles Winn offering was not registered with the Commission.

25.　The investors resided in various states throughout the United States, including 15 in California and six in this district. Most of them were elderly, and many were not accredited.

**I.　Scott-Britten Directed Smith to Form Charles Winn.**

26.　In or about August 2017, Scott-Britten directed Smith to form Charles Winn in the United States to solicit U.S. investors for purported fine wine investments.

27.　Thereafter, Smith formed Charles Winn and became its sole record managing member.

28.　In late 2017 or early 2018, Scott-Britten directed Smith to travel to the United States with Scott-Britten's assistant to open bank accounts in the name of Charles Winn.

29.　Smith followed these instructions and opened three U.S. bank accounts in the name of Charles Winn. Smith was listed as the company's "manager/member,"

"member," and "sole owner" in the account opening documents, and had sole signature authority over Charles Winn's U.S.-based bank accounts.

30.     Following his return to the United Kingdom, Smith gave control over Charles Winn's U.S.-bank accounts to Scott-Britten, Stewart, and Scott-Britten's assistant.

31.     From the inception of Charles Winn, Scott-Britten and Stewart acted as co-owners and managers of Charles Winn, controlling all aspects of its business including, without limitation, preparing marketing materials and a website, recruiting and training sales representatives, disciplining sales representatives who did not adhere to sales scripts, reviewing lead lists and hiring a foreign call center, reviewing recordings of telephone calls Charles Winn sales representatives placed to U.S. investors, managing investor funds, purchasing wine and arranging for its storage, and directing payments from its bank accounts, including to Charles Winn staff, sales representatives, and themselves.

32.     From January 2018 and September 2021, Scott-Britten and Stewart acted as control persons of Charles Smith.

## II.     Charles Winn Offered Purported Investments in Fine Wine.

33.     Charles Winn offered fraudulent purported fine wine investments.

34.     Investors typically learned about the fine wine investment opportunity from unsolicited and repeated cold calls from sales representatives who said that they were acting on behalf of Charles Winn.

35.     Junior sales representatives made initial or "opener" calls and typically used a script provided by Scott-Britten and Stewart.

36.     The script included a series of questions for the junior sales representative to ask to determine if investors were "qualified," meaning that they were the primary decision-maker in their household and had at least $5,000 to $10,000 available for investment.

37.     The script also included questions about whether the investor was accredited. However, the junior sales representatives did not always ask whether investors were accredited, and sometimes ignored negative responses, proceeding with the sales pitch regardless. If a prospective investor indicated interest, the junior sales representative would arrange for Charles Winn to send marketing materials to the investor via mail or email, using email addresses associated with Charles Winn.

38.     Charles Winn's senior sales representatives would then follow-up with an additional call or calls to "close" the deal, following scripts prepared by Scott-Britten and Stewart and sometimes using assumed names.

39.     The senior sales representatives, who usually had British accents, represented that: (a) they would recommend specific vintages of investment-grade wines for the investor to purchase; (b) wine was a lucrative investment; (c) the company had access to appropriate markets to sell the appreciated wines at a later date; and (d) the wines would be stored in a secure, climate-controlled facility in France or the United Kingdom for the duration of the investment to preserve the wines' value and minimize taxes.

40.     The Charles Winn senior sales representatives also told investors that the funds they invested would be used exclusively to purchase and store wine that would be the property of the individual investors.

41.     The investors, many of whom were not familiar with wine investments, were not expected to participate in the selection of their wines, their storage, or the resale process.

42.     Instead, the investors relied on the expertise of Charles Winn to generate a profit by recommending wines likely to increase in value, arranging to store them in a manner that would preserve their value, and identifying buyers for the appreciated wines.

43.    The only decisions the investors made were whether to invest in the wine recommended by Charles Winn senior sales representatives and whether to agree to the sale of their wine.

44.    The Charles Winn senior sales representatives told investors that Charles Winn had access to certain markets to sell the wine, including purported wealthy individual buyers in China or India, high-end restaurants, and wine auctions.

45.    The Charles Winn senior sales representatives also told investors that they could expect to make a profit because the wine would appreciate significantly in value (ranging from 10% to 45%) within a short time period (generally ranging from several months to a few years).

46.    The Charles Winn senior sales representatives did not tell investors that they were required to hold the wine for any minimum period.

47.    The Charles Winn senior sales representatives told investors they would realize the profit when the wine was sold.

48.    The Charles Winn senior sales representatives told investors that the only compensation Charles Winn would receive for its wine investment services was a commission – typically 10% of wine sale profits, but sometimes as low as 5% or as high as 30% – upon sale of the investor's wine to a new purchaser.

49.    The Charles Winn senior sales representatives also told investors that Charles Winn would not be entitled to any compensation until the sale of the wine.

50.    Stewart trained Charles Winn senior sales representatives on what to tell investors on "closer" calls.

51.    Further, Scott-Britten, Stewart, and Smith received audio recordings via email of these "closer" calls. For example:

(a)    On January 30, 2019, Smith sent an email to Scott-Britten attaching a recording of a telephone call between a Charles Winn senior sales representative and an investor on which the sales representative stated: "Our clients have consistently been able to achieve an average yield on their investment outlay

anywhere between 15% up to 40% on a year in and a year out basis" and touted that Charles Winn sold clients' wine to "blue chip conglomerates," like restaurant chains, casinos, hotels, and first class private jet airlines.

(b)    On June 24, 2019, Smith sent an email to Scott-Britten attaching a recording of a telephone call between a Charles Winn senior sales representative and an investor where the sales representative stated: "We do not get paid until we sell you out of the markets. . . . We are a performance-based brokerage . . . the more money I make you, the more money I make myself."

(c)    On October 21, 2019, Smith sent an email to Stewart attaching recordings of telephone calls between Charles Winn senior sales representatives and investors where, in one call, the sales representative encouraged the investor to buy more wine to make his portfolio more attractive instead of selling.

(d)    In another recorded telephone call attached to the same October 21, 2019 email from Smith to Stewart, the Charles Winn senior sales representative stated that: (a) the investor should expect 15-27% returns; and (b) "I am a performance-based broker . . . I don't take money up front. . . . I make 10% of the profits I sell you and 10% only."

52.    Alexander made similar misstatements on recorded calls with investors. For example:

(a)    On or about June 26, 2020, Alexander told an investor that "all you pay me . . . is 10%, but only from your profit. So . . . the more money I make for you, the more money I make for myself."

(b)    On or about September 28, 2020, in an attachment to an email from Smith to Stewart, Alexander told an investor that (a) a 20% annual return on investment is the minimum expected return; and (b) a Charles Winn broker "is paid solely based upon performance," "only makes 10% of their client's profit at the point of sale," and "I don't get paid until you do."

53.    Alexander solicited investors by making numerous phone calls every

work day to try to persuade investors to invest in Charles Winn's offering.

54.     In making these sales calls for Charles Winn, Alexander (1) negotiated the amount of each investment; (2) provided investment advice by espousing the purported high return and low risk nature of wine investments as reasons to invest in fine wine rather than other investment opportunities; and (3) received transaction-based commissions from Charles Winn for each sale he made.

55.     Charles Winn senior sales representatives urged existing investors to buy more wine during subsequent "loader" calls, either because of a purported timely sale opportunity that would be maximized by creating a more attractive package for the supposed buyer, or in response to an investor request to sell some or all of their wine to realize purported profits or free up investment capital for other uses.

### A.     Charles Winn Provided Investors with a Website and Marketing Materials.

56.     Charles Winn, through Scott-Britten and Stewart, maintained a public website ("Website") describing the wine investment and provided marketing materials to investors ("Marketing Materials").

57.     Scott-Britten and Stewart controlled the Website and Marketing Materials.

58.     The Marketing Materials stated, among other things, that the goal of the wine investments was to earn at least a 10% annual return.

59.     The Website and Marketing Materials also touted the rising profitability of the fine wine investment market, how fine wine has outperformed other investment options, and the companies' expertise in achieving those profits for investors.

60.     For example, the Marketing Materials stated that the investment goal was "to create high capital appreciation" and claimed Charles Winn had "repeatedly achieved this through investing in . . . wines from Bordeaux."

61.     The Marketing Materials further stated that Charles Winn would "develop an individual portfolio[] for each customer, specifically tailored to suit your investment goals."

62.     The Marketing Materials also stated that Charles Winn's compensation for their services would cover "the entire expense" of storing, handling, and insuring the investor's wine.

**B.     Charles Winn Entered Into Contracts
        with Investors and Collected Investor Funds.**

63.     The written contracts between Charles Winn and its investors stated that the investor funds would be used to buy and store wine and that Charles Winn would charge a commission of 10% of the wine sale profits.

64.     This 10% commission of the profits is the only form of compensation to Charles Winn disclosed in the contract.

65.     Charles Winn investors sent their funds via check or wire to two of the three U.S.-based bank accounts held in the name of Charles Winn.

66.     Following the receipt of investor funds, Charles Winn typically sent investors an invoice listing the wine product and volume purportedly purchased on their behalf.

67.     Charles Winn solicited its existing investors multiple times, encouraging them to add to their "wine portfolio."

68.     Numerous investors made multiple wine investments with Charles Winn.

69.     Based on the foregoing, Charles Winn investors invested in investment contracts.

**III.    Charles Winn Made Misrepresentations and Omissions of Material Fact
        to Investors and Misused Investor Funds.**

70.     Between January 2018 and September 2021, Charles Winn received approximately $8,530,000 from about 121 investors in the fraudulent investment

scheme, but used no more than $3.65 million (43%) on the purchase and storage of wine.

71.     Charles Winn has returned a total of approximately $19,000 to two investors.

72.     Charles Winn representatives told the two investors that the returned funds were purported profits from wine sales, but the investors did not receive any sale documentation.

73.     Charles Winn's $19,000 payment to investors was well below the promised return, which Charles Winn representatives said would range from 10% to 45% per investment.

74.     Charles Winn, through Scott-Britten and Stewart, who directed the payments from the bank accounts, and Smith, who opened the accounts, was sole signatory on them, and approved certain payments, misused the remaining investor funds on a variety of non-wine uses, including at least $1.7 million for payments to individuals, including Charles Winn sales representatives such as Alexander, who received at least $121,156, and workers who performed back-office functions.

75.     Scott-Britten, Stewart, and Smith also caused Charles Winn to misuse investor funds for their own benefit and the benefit of their family and affiliated entities.

76.     Specifically, out of the $1.7 million payments to individuals, Charles Winn sent at least $311,094, $483,596, and $43,459 directly to Scott-Britten and Stewart (and their family and/or affiliated entities), and Smith, respectively.

77.     Scott-Britten, Stewart, Alexander, and Smith also received additional investor funds indirectly, through payments from a U.K. affiliate of Charles Winn, to which some Charles Winn investor funds were sent.

78.     Other than the investor funds and approximately $156,000 received from another entity in the wine investment business, Charles Winn had minimal other income during this period.

79.    The payments to Charles Winn sales representatives and back-office workers, Scott-Britten and Stewart (and their family and/or affiliated entities), and Smith from investor funds were misuses because they were contrary to the oral and written representations made to investors that investor funds would be used only to purchase and store wine and that Charles Winn would only receive compensation upon the sale of investors' wine, which had not occurred at the time the payments were made.

80.    In reality, Charles Winn paid its sales representatives a commission of 5% to 15% when the investor submitted funds, and not when Charles Winn sold the investor's wine.

81.    Moreover, on top of these sales commissions, Charles Winn offered successful sales representatives various "opener[] incentives" and "closer bonuses" for settling multiple "deals." For example, in a June 1, 2020 email from Smith to Stewart, Smith attached two flyers advertising such incentives, including £3,500 or a Cartier or Rolex watch to openers who closed five or seven "deals," respectively, and £5,000 or £10,000 watch of "your choice" to closers who "settled" eight or ten "deals," respectively.

82.    Pursuant to the investor contracts, Charles Winn, who paid individuals, including Scott-Britten and Stewart (and their family and/or affiliated entities), Alexander, and Smith, at least $1.7 million of investor funds, was not entitled to receive any money until an investor's wine was sold to a new buyer, and was then only entitled to 10% of the profits from that sale.

83.    As reflected in the recordings described above, Charles Winn senior sales representatives did not disclose to investors that they were receiving any compensation up front. Indeed, they repeatedly touted that they were a performance-based brokerage and that only made money when the investor made money – when the wine was sold at a profit.

84.    Accordingly, Charles Winn, Scott-Britten, and Stewart knew, or were

reckless in not knowing, and Smith was at least negligent in not knowing that that the statements and omissions to investors described above, via the Website, Marketing Materials, contracts, and Charles Winn sales representatives, were false and/or misleading because (a) Charles Winn, Scott-Britten, Stewart, and Smith were not using all of investor funds to purchase and store wine; (b) Charles Winn was making significant payments to, among others, Defendants, their family and/or affiliated entities, sales representatives, and back-office workers, from investor funds before the wine was sold; and (c) investors only received minimal payments and not the represented 10% to 45% returns.

85. In addition, Alexander knew, or was reckless in not knowing, that the statements and omissions he made to investors were false and/or misleading because Charles Winn was making significant payments to him and other sales representatives from investor funds before the wine was sold.

## IV. Charles Winn Lulls Investors and Ceases Operations.

86. Charles Winn sales representatives repeatedly tried to lull investors into holding their investments or reinvesting in the fraudulent wine investment scheme.

87. For example, when investors contacted Charles Winn to inquire about selling their wine, sales representatives would tell them that their portfolios were not desirable enough, and they needed to purchase additional wine to make their "wine portfolio" attractive to a buyer.

88. In response to these solicitations, multiple investors sent additional funds.

89. Similarly, Charles Winn sales representatives sometimes told investors by telephone that a wine auction would be held several months in the future.

90. However, there is no evidence the wine auction actually occurred or that Charles Winn ever sold investors' wine, at a profit or otherwise, or returned any wine profits to investors.

91.     Charles Winn appears to have ceased soliciting investors and the company has stopped responding to investor inquiries.

92.     Charles Winn closed two of its U.S.-bank accounts in June 2020 and June 2021, respectively. As of October 2022, Charles Winn's remaining account had a balance of $27.

## FIRST CLAIM FOR RELIEF

### Violations of Securities Act Section 5(a) and (c)
### (against all Defendants)

93.     The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 92, as though fully set forth therein.

94.     By reason of the acts and conduct described in this Complaint, Charles Winn, Scott-Britten, Stewart, Alexander, and Smith, directly or indirectly, singly and in concert with others, have: (a) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement was in effect; and/or (b) for the purpose of sale or delivery after sale, carried and caused to be carried through the mails and interstate commerce, by the means and instruments of transportation, securities as to which no registration statement was in effect; and/or (c) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

95.     By reason of the foregoing, Charles Winn, Scott-Britten, Stewart, Alexander, and Smith, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, Section 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c).

**SECOND CLAIM FOR RELIEF**

**Violations of Exchange Act Section 10(b) and Rule 10b-5**
**(against Defendants Charles Winn, Scott-Britten, Stewart, and Alexander)**

96.     The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 92, as though fully set forth therein.

97.     By reason of the acts and conduct described in this Complaint, Charles Winn, Scott-Britten, Stewart, and Alexander, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails: (a) used and employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon any person.

98.     Charles Winn, Scott-Britten, Stewart, and Alexander intentionally or recklessly engaged in the fraudulent conduct described above.

99.     By reason of the foregoing, Charles Winn, Scott-Britten, Stewart, and Alexander, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

**THIRD CLAIM FOR RELIEF**

**Violations of Securities Act Section 17(a)(1)**
**(against Defendants Charles Winn, Scott-Britten, Stewart, and Alexander)**

100.    The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 92, as though fully set forth therein.

101.    By engaging in the acts and conduct described in this Complaint, Charles Winn, Scott-Britten, Stewart, and Alexander, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or

communication in interstate commerce or by use of the mails employed devices, schemes, and artifices to defraud.

102.    Charles Winn, Scott-Britten, Stewart, and Alexander intentionally or recklessly engaged in the fraudulent conduct described above.

103.    By reason of the foregoing, Charles Winn, Scott-Britten, Stewart, and Alexander, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

### FOURTH CLAIM FOR RELIEF

**Violations of Securities Act Section 17(a)(2) and (a)(3)**
**(against all Defendants)**

104.    The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 92, as though fully set forth therein.

105.    By engaging in the acts and conduct described in this Complaint, Charles Winn, Scott-Britten, Stewart, Alexander, and Smith, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails: (a) obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (b) engaged in transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon purchasers or prospective purchasers.

106.    Charles Winn, Scott-Britten, Stewart, and Alexander were intentionally, recklessly, or negligently engaged in the fraudulent conduct described above.

107.    Smith was negligently engaged in the fraudulent conduct described above.

108.    By reason of the foregoing, Charles Winn, Scott-Britten, Stewart, Alexander, and Smith, directly or indirectly, violated, is violating, and, unless

enjoined, will continue to violate Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## FIFTH CLAIM FOR RELIEF

### Violations of Exchange Act Section 15(a)(1)
### (against Defendant Alexander)

109.   The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 92, as though fully set forth therein.

110.   By engaging in the acts and conduct described in this Complaint, Alexander made use of the mails and other means or instrumentalities of interstate commerce to effect transactions in, induced or attempted to induce the purchase or sale of, securities for the accounts of others without being registered with the SEC in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b).

111.   By reason of the foregoing, Alexander, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Exchange Act Section 15(a), 15 U.S.C. § 78o(a)(1).

## SIXTH CLAIM FOR RELIEF

### Violations of Exchange Act Section 10(b) and Rule 10b-5
### (against Defendants Scott-Britten and Stewart as
### Control Persons over Defendant Charles Winn)

112.   The SEC repeats, realleges, and incorporates by reference paragraphs 1 through 92, as though fully set forth therein.

113.   As alleged above, Charles Winn violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

114.   At all relevant times, Scott-Britten and Stewart were control persons of Charles Winn for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

115.   At all relevant times, Scott-Britten and Stewart exercised power and control over Charles Winn, including by managing and directing that entity, and by

19

directing and participating in the acts constituting Charles Winn's violations of the securities laws.

116.   By reason of the foregoing, Scott-Britten and Stewart are liable as control persons under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for Charles Winn's violations of the Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants Charles Winn, Scott-Britten, Stewart, Alexander, and Smith committed the alleged violations.

### II.

Issue orders of permanent injunction restraining and enjoining: (a) Defendants Charles Winn, Scott-Britten, and Stewart, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and (c) and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b; (b) Defendant Alexander, and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and (c) and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a), and Section 10(b) and 15(a)(1) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78o(a)(1), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b; and (c) Defendant Smith, and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating

Sections 5(a) and (c) and 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(2), 77q(a)(3).

### III.

Order Defendants Charles Winn, Scott-Britten, Stewart, Alexander, and Smith to disgorge all ill-gotten gains derived from their illegal conduct as set forth in this Complaint, including prejudgment interest thereon pursuant to Section 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act, 15 U.S.C. § 78u(d)(3), (d)(5), and (d)(7).

### IV.

Order Defendants Charles Winn, Scott-Britten, Stewart, Alexander, and Smith to pay civil monetary penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

### V.

Enter an Order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), permanently prohibiting Defendants Scott-Britten and Stewart from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

### VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VII.

Grant such other and further relief as this Court may determine to be just and necessary.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff SEC demands a trial by jury on all claims so triable.


Dated:  April 20, 2023          */s/ Donald W. Searles*
                                DONALD W. SEARLES
                                Attorney for Plaintiff
                                Securities and Exchange Commission